

**SIGNED this 27 day of June, 2008.**

                                                  _____
                                                      R. Thomas Stinnett
                                         **UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

In re:                                                                                  No. 08-10782
                                                                                        Chapter 13
DAVID RUSSELL BOLLER,

    Debtor(s).

## MEMORANDUM

This contested matter is before the court on the objection by Jill Boller, the debtor's former spouse, to confirmation of the debtor's chapter 13 plan for failure to provide for payment in full of a domestic support obligation. Although the parties were provided an opportunity to present evidence, they submitted that the only evidence necessary for the court to consider was the divorce decree which incorporated a Compromise Agreement signed by the parties. The affidavit of Ms. Boller's divorce attorney is attached to the brief filed on her behalf in this matter, to which no objection was raised by the debtor. Otherwise, the parties submitted no additional evidence for the court to consider. The court

took the matter under advisement and the parties submitted briefs. Upon review of the record as a whole and the parties' briefs, and for the reasons set forth herein, the court will overrule the objection and confirm the plan.

This is a core proceeding. 28 U.S.C. § 157(b)(2)(A) and (L).

**FACTS**

The parties married on September 20, 2003. On December 19, 2007, they obtained a divorce in the Superior Court for Catoosa County, Georgia, on the grounds that the marriage was irretrievably broken. Both parties were represented by attorneys during the divorce proceeding. The parties signed a Temporary Order on September 12, 2007, providing for allocation of debt payments and child support. Without making specific findings of fact or conclusions of law, the final divorce decree of December 19, 2007, incorporated a Compromise Agreement signed by the parties on December 13, 2007.[1] The Compromise Agreement states that the parties intend ". . .to make a complete and final settlement of all claims that each party may have against the other party and to finalize their agreement as to the division of the real and personal property owned by them jointly or either of them individually, and to make adequate and sufficient provision by written agreement for the equitable settlement of any property rights between the parties." The Compromise Agreement provides considerable detail with respect to support of the parties' minor child, including a lump-sum child support payment by the debtor to Ms. Boller in the amount of $1,227.91 for December 2007, and for continued payment of daycare expenses.

---

The first paragraph of the Compromise Agreement indicates that it was entered December 13, 2008. The agreement was signed by the parties on December 4 and 13, 2007.

The Compromise Agreement acknowledges a substantial reduction in the debtor's income in January 2008, necessitating a reduction in the amount of monthly child support to $927.87 beginning January 2008 until the minor child attains eighteen years of age or graduates from high school, whichever is later.

The only direct reference to support for Ms. Boller occurs in Article V which provides that "Husband shall pay no alimony to Wife, and Wife expressly releases her claim for alimony against the Husband."

Article VI provides that title to the real estate jointly owned by the parties is to be divested from Ms. Boller to the debtor who will be solely responsible for all mortgage payments, taxes, insurance and upkeep.  Furthermore, the Compromise Agreement requires the debtor to make all reasonable efforts to refinance the home and to remove Ms. Boller's name from the mortgage within 120 days of the entry of the final decree.  Ms. Boller released her equity in the home and agreed to sign a quitclaim deed when presented by the debtor.

In Article VI, which addresses personal property, each party agreed to retain his or her own vehicle, to maintain payments, and to hold the other party harmless from any payments for the vehicle in his or her possession.

Article VII addresses the parties' debts.  The debtor assumed the parties' joint debts described in the September 12, 2007, Temporary Order, except for an obligation to Dell Computer which Ms. Boller assumed.  Also, Ms. Boller agreed to continue paying other debts that she was ordered to pay in the Temporary Order, including the obligations to Goody's, Old Navy, Anesthesiology Consultants, Memorial Hospital, and FSG Bank. The record contains no evidence of the amounts of these debts.   Debts for which the

debtor was responsible in the Temporary Order and which were included by reference in the Compromise Agreement and the Final Decree included AOL, Bank of America, Capital One #1, Capital One #2, American Express, Erlanger, Home Depot, Household Credit, HSBC, JC Penney, MBNA, Providian, Rooms-To-Go, Shell, Target, Bank of America #2, CitiBank, Anesthesia Associates, and Verizon. The Compromise Agreement also provides that the debtor will reimburse $3,166.87 to Ms. Boller for certain unspecified "marital debts" that she paid which the debtor was ordered in the Temporary Order to pay during the interim period between the issuance of the Temporary Order and the Compromise Agreement. The debtor agreed to pay monthly installments of $50 with the balance to be fully paid within three years of the entry of the Final Decree of divorce. Certain fees awarded to Ms. Boller at a Temporary Hearing also were to be paid by the debtor by December 15, 2007, and unpaid medical expenses in the amount of $80.50 incurred on behalf of the parties' minor child were due and payable by the debtor during the first week of December 2007. Any and all debt incurred by the parties in their individual names after separation would be the responsibility of that party who would indemnify and hold harmless the other party. Article X provides that each party would bear responsibility for his or her own attorney's fees and expenses. Article XV provides that there are no agreements or understandings between the parties except those expressly mentioned in the Compromise Agreement, and no representations or warranties were made by or on behalf of either party to the other besides what is expressly mentioned in the Compromise Agreement.

        The debtor filed his chapter 13 petition on February 18, 2008. Schedule E filed with the petition reflects no unsecured priority claims. Schedule F reflects the $3,166.87 claim owed to Ms. Boller as unsecured and classifies it as a § 523(a)(15) claim,

which is an obligation to a former spouse or child of the debtor and not of the kind described in § 523(a)(5) that is incurred by the debtor in the course of a divorce or in connection with a divorce decree. Schedule F also includes various claims which the debtor states are Ms. Boller's, and which total $11,988.16.[2] The proposed plan provides for payments over 60 months of $765 bi-weekly, with non-priority unsecured claims to receive a pro-rata distribution. Ms. Boller objects to the proposed plan's failure to provide for obligations owed to her pursuant to the divorce decree, arguing that the obligations are in the nature of alimony, maintenance, or support, and are therefore domestic support obligations entitled to priority status and payable in full. The issue before the court is whether the disputed claims constitute domestic support obligations necessitating treatment as priority claims payable in full during the life of the plan. Alternatively, Ms. Boller argues that the claims are in the nature of support under 11 U.S.C. § 523(a)(15) and that they must be paid in full over the life of the plan as non-dischargeable obligations.

Treatment of debts incurred by a chapter 13 debtor in connection with a judicial order to pay a domestic support obligation requires review of the interplay among three separate provisions of the Bankruptcy Code. The chapter 13 plan must "provide for the full payment, in deferred cash payments of all claims entitled to priority under section 507 of this title, unless the holder of a particular claim agrees to a different treatment of

---

[2] The brief submitted by counsel for Ms. Boller states that the total of all of the debts assumed by the debtor in accordance with the Final Decree and listed in the debtor's schedules as debts of Ms. Boller, is $12,396.39. Ms. Boller also filed a proof of claim for $12,396.39 for "Support/Debt Payments." Since the amount of the claim is not at issue in the objection to confirmation but rather its classification and treatment under the plan, and since the debtor has filed an objection to the claim, the court will not resolve the discrepancy in the amounts in this proceeding.

such claim.  11 U.S.C. § 1322(a)(2).

11 U.S.C. § 507(a)(1) provides:

(a) The following expenses and claims have priority in the following order:
   (1) First:
      (A) Allowed unsecured claims for domestic support obligations that, as of the date of the filing of the petition in a case under this title, are owed to or recoverable by a spouse, former spouse, or child of the debtor, or such child's parent, legal guardian, or responsible relative, without regard to whether the claim is filed by such person or is filed by a governmental unit on behalf of such person, on the condition that funds received under this paragraph by a governmental unit under this title after the date of the filing of the petition shall be applied and distributed in accordance with applicable nonbankruptcy law.

11 U.S.C. § 507(a)(1)(A)(2005).

"Domestic support obligations" are defined in 11 U.S.C. § 101(14A)(2005):

The term 'domestic support obligation' means a debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is–

(A) owed to or recoverable by–
 (i) a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
 (ii) a government unit;

(B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor such child's parent, without regard to whether such debt is expressly so designated;

(C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of–
 (i) a separation agreement, divorce decree, or property settlement agreement;
 (ii) an order of a court of record; or
 (iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and

(D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of

>  the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

11 U.S.C. § 101(14A)(2005).

The parties agree that their dispute concerns the provisions of sub-paragraph (B) of § 101(14A), since sub-paragraphs (A) and (C) have been satisfied, and sub-paragraph (D) is inapplicable.

Section 101(14A) was added to the Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). In determining what constitutes debt "in the nature of alimony, maintenance, or support" under § 101(14A), the case law construing pre-BAPCPA § 523(a)(5), which utilized the same language, is relevant. *See Dobbs v. Loehrs (In re Loehrs)*, 2007 WL 188364, at *3 n.3 (Bankr. N.D. Okla. Jan. 22, 2007). Whether an obligation is in the nature of alimony, maintenance, or support is a determination of federal law for which state law may provide guidance. *In re Strickland, 90 F.3d 444, 446 (11th Cir. 1996); Harrell v. Harrell (In re Harrell), 754 F.2d 902, 905 (11th Cir. 1985); In re Durrance*, 357 B.R. 673, 678 (Bankr. M.D. Ga. 2005)(*citing Cummings v. Cummings*, 244 F.3d 1263, 1265 (11th Cir. 2001)). Bankruptcy courts considering this issue look beyond the labels used by the parties to decide whether they intended the obligation to function as support or alimony at the time of the creation of the obligation. *Cummings*, 244 F.3d 1263, 1265; *Butler v. Butler (In re Butler)*, 277 B.R. 843, 850 (Bankr. M.D. Ga. 2002). To be excepted from discharge pursuant to § 523(a)(5), joint marital obligations assumed by the debtor in connection with a divorce settlement must be actually in the nature of alimony or support, and the determinative issue is generally whether or not the parties intended the assumption of the debts to be in lieu of alimony or support payments or a means of dividing the marital property. *See Long v. Calhoun (In re*

*Calhoun)*, 715 F.2d 1103, 1107 (6th Cir. 1983); *Butler v. Butler (In re Butler)*, 277 B.R. 843, 851 (Bankr. M.D. Ga. 2002)(citing *Frey v. Frey (In re Frey)*, 212 B.R. 728, 736 (Bankr. N.D.N.Y. 1996); *Smith v. Edwards (In re Smith)*, 207 B.R. 289, 291-92 (Bankr. M.D. Fal. 21997); *Rooker v. Rooker (In re Rooker)*, 116 B.R. 415, 417 (Bankr. M.D. Pa. 1990)).

In the Sixth Circuit, *Long v. Calhoun (In re: Calhoun)*, 715 F.2d 1103 (6th Cir. 1983) is the seminal case for the determination of whether an obligation incurred in a divorce is "in the nature of alimony, maintenance or support." In weighing the approaches of different bankruptcy and circuit courts in addressing the issue of when an assumption of a joint obligation is in the nature of alimony, maintenance or support, the court observed:

> The initial difficulty is that every assumption of a joint loan obligation in a divorce settlement at least indirectly contributes to support. The former spouse is relieved of payments on that debt and thus has funds for other purposes including necessary support. Support in this broad sense results even if the assumption of joint marital debts is actually a division of property. It is clear from the statute and legislative history that Congress could not have intended that all assumptions of joint debts would be nondischargeable. Such assumptions of debt are discharged "to the extent that payment . . . is not actually in the nature of alimony, maintenance or support. . ." 124 Cong. Rec. 4, 11,096 (daily ed. Sept. 28, 1978)(Rep. Edwards) 517, 412 (daily ed. Oct. 6, 1978)(Sen. DeConcini). To interpret § 523 in this broad sense envisages results at odds with the "fresh start" concept which underlies the Bankruptcy Act.

*Id.* at 1108-09 (citations omitted). The court then proceeded to establish a test to assist with determining whether the obligation in question is in the nature of alimony, maintenance or support. The test includes: (1) whether the parties or the court manifested the intent to create a support obligation; (2) whether the obligation has the actual effect of providing the necessary support in light of the recipient's present needs; and (3) upon satisfaction of (1) and (2), whether, even in the nature of support, the amount of the obligation is manifestly unreasonable. If unreasonable, the obligation is dischargeable to the extent necessary to

serve the purposes of bankruptcy law. *Long v. Calhoun (In re Calhoun)*, 715 F.2d 1103, 1109-10 (6th Cir. 1983). However,

> . . . the initial inquiry must be to ascertain whether the state court or the parties to the divorce *intended* to create an obligation to provide support through the assumption of the joint debts. If they did not, the inquiry ends there. There is no basis for the bankruptcy court to create a non-dischargeable obligation for the debtor that the state court granting the divorce decree or the parties to that proceeding did not create.

*Calhoun,* at 1109 (emphasis in original).

Ten years later, the Sixth Circuit limited and distinguished the application of *Calhoun* in *Fitzgerald v. Fitzgerald (In re Fitzgerald)*, 9 F.3d 517 (6th Cir. 1993), holding that the bankruptcy court should not consider whether the support is necessary (the second part of the *Calhoun* test) when the divorce decree specifically designates the obligation in question as one for alimony, maintenance, or support, and when the evidence shows that the court or the parties intended for the obligation to be one of support. The *Fitzgerald* court distinguished *Calhoun*, observing that *Calhoun* required the court ". . . to determine whether something not denominated as support in the divorce decree was really support, [but] here the only question is whether something denominated as alimony is really alimony and not, for example, a property settlement in disguise." *Fitzgerald*, 9 F.3d at 521.

Five years later, the Sixth Circuit again revisited the issue in *Sorah v. Sorah (In re Sorah)*, 163 F.3d 397 (6th Cir. 1998). The *Sorah* court held that the bankruptcy court should not have considered the former wife's need for support (the second part of the *Calhoun* test), since the obligation was identified as "maintenance" and intended as such. *Id.* at 402. Indeed, after a review of the state court record, the bankruptcy court concluded that regardless of the divorce decree's designation of the obligation as "maintenance," it actually was a property distribution imposed for the purpose of punishing the philandering

debtor/husband, and, therefore, dischargeable. *Id.* at 400. In its decision, the Sixth Circuit observed that, despite its admonition in *Fitzgerald,* the bankruptcy court had ". . . engaged in an independent inquiry into whether the award was actually in the nature of support, hypothesizing in particular that the [state] Court granted maintenance to [the spouse] based upon its disapproval of [the debtor's] behavior during the marriage. We find that such an independent analysis under the circumstances of this case is inconsistent with *Fitzgerald* and fails to give proper deference to state divorce court decrees." *Id.* at 401. Elaborating further, the bankruptcy court was instructed to

> . . . look to the traditional state law indicia that are consistent with a support obligation. These include, but are not necessarily limited to, (1) a label such as alimony, support, or maintenance in the decree or agreement, (2) a direct payment to the former spouse, as opposed to the assumption of a third-party debt, and (3) payments that are contingent upon such events as death, remarriage, or eligibility for Social Security Benefits.
>     An award that is designated as support by the state court and that has the above indicia of a support obligation (along with any others that the state support statute considers) should be conclusively presumed to be a support obligation by the bankruptcy court. A non-debtor spouse who demonstrates that these indicia are present has satisfied his or her burden of proving that the obligation constitutes support within the meaning of § 523, and is thus nondischargeable. *See Calhoun*, 715 F.2d at 1111. . . The burden then shifts to the debtor spouse to demonstrate that although the obligation is of the *type* that may not be discharged in bankruptcy, its *amount* is unreasonable in light of the debtor spouse's financial circumstances.

*Sorah*, 163 F.3d at 401 (emphasis in original). Furthermore, if the non-debtor spouse establishes that the obligation has all of the indicia of support, the debtor spouse may not introduce evidence to the contrary, nor may the debtor "introduce evidence regarding the resources, earning potential, and daily needs of the non-debtor spouse, either at the time the obligation arose or at the time of the bankruptcy proceeding. This portion of the *Calhoun* analysis is inappropriate when the state court has clearly structured the obligation as support." *Id.* at 402. Applying these standards to the facts in *Sorah*, the court observed

that the divorce decree specifically stated that it was awarding maintenance; the obligation was structured as a maintenance obligation with monthly payments to the non-debtor spouse to continue until death, remarriage or the non-debtor spouse's 62nd birthday, whichever occurs first; the obligation was contingent upon one of the three conditions provided; the obligation was to be paid directly to the non-debtor spouse rather than as an assumption of a third-party debt; and the state court denominated the obligation as "maintenance."  Thus, the obligation was conclusively established as actually in the nature of support, obviating the need to determine whether the obligation had the effect of maintenance in light of the non-debtor spouse's needs.  *Sorah,* 163 F. 3d at 402. Therefore, the obligation was declared non-dischargeable.

The structure of the agreement or decree determines whether the obligation was intended as support.  If the structure of the agreement or decree confirms the intent to create support, then the bankruptcy court need not reconstruct the analysis of the state court and the parties.  The evolution of the Sixth Circuit's approach in *Calhoun*, *Fitzgerald*, and *Sorah* to the structure of the parties' agreement is not unlike the application of statutory interpretation wherein further inquiry into the state court's or the parties' intent is required only if ambiguity is present.  If there is no ambiguity in light of the traditional indicia, the inquiry ends.  *See Cordia v. Cordia (In re Cordia)*, 280 B.R. 138, 145.

In *Sorah*, the state court labeled the award as "maintenance" but the bankruptcy court incorrectly discharged it as not in the nature of support.  In this case, however, the debtor's obligations are *not* labeled as support; indeed, alimony is specifically waived.  Therefore, the issue is whether "the absence of the traditional indicia of support [from *Sorah*] forecloses further review of the award.  In other words, can the court use the

indicia conversely to establish that an award is not in the nature of support?" *Cordia*, 280 B.R. at 145.   This court, like the *Cordia* court, finds that the answer is yes.  *Id.*

Unlike *Sorah*, there is no label of support in the Compromise Agreement and alimony is waived; all payments except the reimbursement payment are to be remitted to third parties rather than to the spouse; and payment of the obligations is not contingent upon the death, remarriage, or Social Security eligibility of the former spouse.  Therefore, the three threshold indicia from *Sorah* are not present in this case.

*Sorah* stands for the proposition that the designation of an obligation as alimony, maintenance or support in a divorce decree provides a strong, if not conclusive, presumption of an intent to provide alimony, maintenance, or support.  Conversely, the party who contends that the parties or the state court intended in the divorce decree to provide support where it has been expressly waived must establish, by a preponderance of the evidence, strong indicia from the face of the decree or other finding by the state court to overcome evidence of an intent to waive the support.  Unfortunately, the record is bereft of evidence sufficient to overcome the evidence of the parties' intent not to provide for spousal support in the Compromise Agreement.  Furthermore, since both parties had the benefit of the advice of counsel in crafting the Compromise Agreement, the court must assume that they understood the import of the language used by the Compromise Agreement in the context of the bankruptcy laws.   Accordingly, the court finds that the obligations created by the Compromise Agreement are not in the nature of alimony, maintenance, or support, and do not constitute domestic support obligations as that term is defined in 11 U.S.C. § 101(14A)  Therefore, the obligations are not entitled to priority under 11 U.S.C. § 507(a)(1) and the debtor is not required to provide for full payment

thereof during the life of the plan under 11 U.S.C. § 1322(a)(2).

Finally, Ms. Boller offers two alternative arguments under 11 U.S.C. § 523(a)(15). First, she asserts that a finding by the court that the obligations in the Compromise Agreement are not domestic support obligations renders them non-dischargeable under § 523(a)(15) as any other obligation that is not alimony, maintenance or support obligation. Therefore, the obligations must be paid in full during the pendency of the case. In support of her argument, Ms. Boller cites *Lowell v. Lowell (In re Lowell)*, 2005 WL 4225742 (Bankr. N. D. Ga. 2005), a chapter 7 case, which was decided prior to the enactment of BAPCPA. However, while the BAPCPA amendment to 11 U.S.C. § 1328(a)(2) excepts § 523(a)(5) debts from discharge, it does not except § 523(a)(15) debts. 11 U.S.C. § 1328(a)(2). *See also Edenfield v. Fussell (In re Fussell)*, 303 B.R. 539, 546 (Bankr. S.D. Ga. 2003); *Williams v. Williams (In re Williams)*, 1998 WL 34064516 (Bankr. S.D. Ga. Sept. 30, 1998). Therefore, upon successful completion of Mr. Boller's chapter 13 case, he will be discharged from the unpaid balances owed on the pre-petition debts.

Ms. Boller's second alternative argument fails as well. She relies upon § 523(a)(15) which provides that a discharge under § 1328(b) does not discharge a debtor from debts not of the kind described in paragraph (5), *i.e.*, domestic support obligations, to a former spouse incurred in connection with a divorce. However, a § 1328(b) discharge is a "hardship" discharge and is granted despite the debtor's failure to complete the plan as confirmed upon a showing that the debtor's failure to complete the payments occurred under circumstances for which the debtor should not be held accountable; unsecured creditors have received more than they would have received if the debtor had filed a chapter 7 case; and modification of the debtor's plan is not practicable. The debtor has not

applied for a hardship discharge; indeed, the plan has not been confirmed. Therefore, reliance upon §§ 523(a)(15) and 1328(b) is misplaced.

The objection by Jill Boller to confirmation of the debtor's chapter 13 plan will be overruled by separate order entered contemporaneously herewith.

# # #